OPINION OF THE COURT
Fuchsberg, J.
We are here called upon to decide whether a hospital which is no longer party to a Blue Cross operating contract may charge patients who are Blue Cross subscribers rates in excess of those allowed by the State as the maximum reimbursable by Blue Cross. The answer to this question is dependent on the construction of the applicable statutes.
Respondent Woman’s Christian Association of Jamestown, Inc. (hereinafter WCA Hospital), operates a nonprofit, nonsectarian, 306-bed hospital in the City of Jamestown in Chautauqua County. It is one of five general hospitals in that area. Respondent Chautauqua Region Hospital Services Corporation (hereinafter Blue Cross), to which over 65,000 subscribers in that part of the State belong, is a nonprofit hospital service corporation organized under article 9-C of the Insurance Law. Following the pattern of agreements between such corporations and their subscribers, the subscription contracts made no provision for care at any particular facility; a "member hospital” is simply referred to generically as "any hospital with which a particular [Blue Cross] plan shall have an operating agreement in effect”.
For years prior to 1976, such an operating agreement between WCA Hospital and Blue Cross had been in force. Like contracts between other hospitals and Blue Cross corporations throughout the State, it provided that WCA Hospital would furnish care to subscribers and that Blue Cross, in turn, would compensate the hospital in accordance with "reimbursement formulas” established by the Commissioner of Health and the *470 Superintendent of Insurance (Public Health Law, art 28, as amd by Hospital Cost Control Law of 1969, L 1969, ch 957).
As the courts below found, early in 1976 WCA learned that the Blue Cross rate for that year would be frozen at the level that prevailed in 1975. This advice followed immediately on the heels of several years during which the hospital had suffered severe operating losses; the hospital’s figures showed that, though Blue Cross subscribers constituted only a minority of its patients, the cost of caring for them exceeded the Blue Cross reimbursements by an amount approximating the total deficit it incurred during the preceding year. Pursuant to a mutual cancellation clause contained in the contract, the hospital thereupon decided to terminate its affiliation with Blue Cross and, on January 8, 1976, it gave Blue Cross the required nine months’ notice that it was electing to do so.
The intended effect of the termination of the relationship was that a Blue Cross subscriber who thereafter chose to be treated at WCA Hospital would have to pay the difference between the Blue Cross reimbursement rate and any higher prevailing rate established by the hospital for its patients generally.
The State asserted that, notwithstanding the contract’s cancellation, the Public Health Law prohibits the hospital from billing a patient more than the amount for which it would have been reimbursed by Blue Cross if the contract were still in effect; acting through the commissioner and superintendent, it then commenced this action to enjoin permanently the implementation of WCA Hospital’s plan. The hospital counterclaimed for a judgment declaring that there is no such statutory prohibition. Both parties having moved for summary judgment, the Supreme Court, Albany County, denied Blue Cross’ motion and granted the declaratory relief requested by the hospital. The judgment directed to be entered thereon has been affirmed by the Appellate Division. The appeal from its order is now here by leave of this court.[1]
The position of the State and of Blue Cross essentially are (1) that the legislative scheme before us was designed to put a lid on soaring hospital expenses by imposing cost controls, (2) that, as to hospital services rendered to Blue Cross subscrib *471 ers, the statutes sought to accomplish this purpose not merely by instituting controls on the amounts which an article 9-C corporation such as Blue Cross may pay hospitals on behalf of its subscribers, but by imposing a more widespread limitation on the amounts hospitals, whether or not they are Blue Cross "member hospitals”, may charge patients who subscribe to Blue Cross and (3) that it was a constitutionally permissible exercise of police power to enact the broader regulation which they argue was intended.
Two of these contentions need not detain us.
That the legislative purpose was to control costs is incontrovertible. It is universal and experiential knowledge that for at least three decades the residents of this State have been sorely pressed by the escalating cost of health care. Its rise has been at a rate exceeding almost every other component of the cost of living index. According to the estimate of the Commissioner of Health himself, between 1948 and 1963 the average cost of a stay in a general hospital in New York State nearly quadrupled, going up from $13.09 to $43.98 per day; by something akin to geometrical progression, it has since multiplied to approximately 20 times the original base.[2] After many earlier pronouncements of alarm, by the time the Hospital Control Law was enacted in 1969, the Legislature took pains to declare it "essential that an effective cost control program be established which will both enable and motivate hospitals to control their spiraling costs” (L 1969, ch 957, § 2).
There is also no question that the economic regulation of hospital costs contemplated by article 28 of the Public Health Law, as amended by the Hospital Cost Control Law, advanced the legitimate legislative purposes of promoting public health, welfare and safety (Nettleton Co. v Diamond, 27 NY2d 182, 189), all consonant with section 3 of article XVII of our State Constitution.
 However, because the Legislature desired to stop or slow the mushrooming of hospital charges, and because argu *472 ably it could do so by imposing direct controls on hospital prices per se, does not mean that that is the course it chose. To the contrary, for the reasons which follow, we have concluded that the method it selected to meet the problem was a less direct one under which a hospital, unless constrained by an ongoing Blue Cross affiliation, is free to apply its own schedule of fees to patients who happen to be Blue Cross subscribers.
Initially, we note that there is nothing in the language of section 2807 of the Public Health Law bespeaking regulation of anything beyond reimbursement payments by Blue Cross, government agencies and health maintenance organizations created under article 44 of the Public Health Law. It contains no provision for putting a ceiling on the charges which hospitals may make to individual patients. Specifically, there is no exception for those individual patients of nonaffiliated hospitals, whether such patients carry Blue Cross or not. Nor does subdivision 2 of section 2803 of the Public Health Law, on which the State places much reliance, enlarge the scope of section 2807; the "rates, payments, reimbursements” to which subdivision 2 of section 2803 refers are, by its own terms, confined to those "provided in” section 2807. Furthermore, if the controls being instituted were not related to Blue Cross coverage alone, it would hardly have been necessary to require approval by the Superintendent of Insurance of the rates certified in the first instance by the Commissioner of Health (Public Health Law, § 2807, subds 2, 3). These statutes were therefore, at the very least, consistent with an intention to achieve the legislative purpose to contain hospital costs by resort to less direct means than the control of hospital prices per se.
An indirect method of control would have been rational. It would have made sense for the Legislature to have anticipated that most Blue Cross subscribers would prefer to patronize a "member hospital”, the strictures of whose own Blue Cross contract would have prevented it from charging subscribers more than the reimbursement rate. Blue Cross reimbursements (along with payments by government agencies) have become the mainstay of hospital income in this State; as the State concedes, in the aggregate it accounts for 90% of the patients. Such reimbursements, coming as they do from an institutional disburser, characteristically involve a "volume of payments, promptness in paying [and] assurance of payment” *473 (Flushing Hosp. & Med. Center v Woytisek, 41 NY2d 1081, 1082). Given these advantages for Blue Cross subscribers and hospital affiliates respectively, it was reasonable for the Legislature to expect that the effect of the free play of competition on a subscriber’s choice between a Blue Cross and non-Blue Cross hospital would be to cause the controlled reimbursement rate to become the voluntary norm for hospital charges generally and to deter hospitals from canceling their Blue Cross affiliations. Indeed, on argument of this appeal, we were advised that, inclusive of WCA Hospital, only about 10 of the approximately 300 hospitals in New York State are not so affiliated at the present time.
Significantly, during one of the intense phases of the upward price trend,[3] the measure then employed to establish reimbursement rates in accordance with chapter 795 of the Laws of 1965, i.e., "the costs of providing such service”, was supplanted by a carefully conceived standard based on "costs of efficient production of such service” (Public Health Law, § 2807, subd 3; Governor’s Memorandum, NY Legis Ann, 1969, p 564). Notedly, in effecting that change, the Legislature, for all its concern, did not articulate an intention to impose cost controls directly on hospitals themselves. Such action — dramatically shifting the policy that has guided the fixing of charges for medical care away from economic laissez-faire and in the direction of direct government control — would have been one of far-reaching consequences (see Matter of Presbyterian Hosp. in City of N. Y. v Ingraham (39 NY2d 867, 869). It would hardly have been one left to implication (cf. Matter of Beary v City of Rye, 44 NY2d 398; Commonwealth v Mercy Hosp., 364 Mass 515, 518).
It is more than interesting therefore to observe that those of our sister States which have decided to impose direct price controls on hospital charges have done so in statutes abundantly "clear and free from ambiguity” (see Guest v Fitzpatrick, 409 F Supp 818, vacated as moot 429 US 1084; see, also, Code of Maryland, art 43, § 568U [1971]; Conn General Statutes, § 19-73i [1973]; Revised Code of Wash, § 70.39.140 [1973]). Parenthetically, despite such statutes, burgeoning hospital costs, as indicated in footnote 2 (supra), have not disappeared from the non-New York scene.
In any event, however alarming the constant increases in *474 health care costs are and however unsuccessful the statutory devices adopted to deal with them may in fact have turned out to be, on the statutes as they presently stand the holding of Special Term and the Appellate Division should be upheld.
Accordingly, the order appealed from should be affirmed.

. Leave to appeal was granted only to the State. Blue Cross, which, despite the affirmance at the Appellate Division, will continue to pay reimbursement only at the rate approved by the State, is here only in the capacity of respondent.

. New York City public hospitals now charge a flat rate of $300 per day, inclusive of various services except blood transfusions. The room rate alone for semiprivate accommodations at Mount Sinai Hospital (like WCA Hospital, a voluntary, nonprofit institution) is now $230 per day; for a private room, it is $295. While the statistics are not identical, the upward surge of medical costs has been a national phenomenon (see the 1948 Hospital Rate Survey, Table 3, p 2 and the Survey of Charges in Community Hospitals as of Jan. 1, 1975, Table A2, p 5, both published by Amer Hosp Assn, Chicago, 111).

. (See, for example, Matter of Procaccino v Stewart, 25 NY2d 301.)